CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 01 2025

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DONALD O., | ) | |
| Plaintiff, | ) | Civil Action No. 4:24-cv-00015 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| FRANK BISIGNANO, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Donald O. asks this Court to review the Commissioner of Social Security's final

decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social

Security Act, 42 U.S.C. §§ 401–434, after a federal-court remand under the fourth sentence of 42

U.S.C. § 405(g). The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having

considered the administrative record ("R."), ECF No. 6-1, the parties' briefs, ECF Nos. 11, 12,

and the applicable law, I cannot find that substantial evidence supports the denial of benefits.

Accordingly, I respectfully recommend the presiding District Judge reverse the Commissioner's

final decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[1] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the written decision subject to judicial review under 42 U.S.C. § 405.

work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Donald filed for DIB in March 2018. R. 135–36. He alleged that he had been disabled since October 21, 2016, because of cervical radiculopathy, sciatica, and chronic back pain secondary to lumbar spondylosis, a bulging disc at L3-4, and a foraminal annular tear at L4-5. *See* R. 149. Donald was 55 years old, or "a person of advanced age" under the regulations, on his alleged onset date. R. 79; 20 C.F.R. § 404.1563(e). Virginia Disability Determination Services ("DDS") denied his claim initially in September 2018, R. 77–87, and upon reconsideration in February 2019, R. 88, 90–97. That August, Donald appeared with counsel and testified at a hearing before ALJ Theodore Kennedy. R. 57–70. A vocational expert ("VE") also testified about Donald's past work and jobs available to someone with Donald's vocational profile who could perform medium work[2] with some postural and environmental limitations. *See* R. 71–73. ALJ Kennedy issued an unfavorable decision on August 19, 2019. R. 12–20; *see* R. 427–28. He concluded that Donald was not disabled from October 2016 through August 2019 because his

---

[2] "Medium work involves lifting or carrying 25 pounds frequently and 50 pounds occasionally." *Bilotta v. Saul*, 850 F. App'x 162, 164 n.4 (4th Cir. 2021) (citing 20 C.F.R. § 404.1567(c)); *see* R. 71. "'A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday' and 'being on one's feet for most of the day is critical.'" *Bilotta*, 850 F. App'x at 164 n.4 (quoting SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983)); *see* R. 71. ALJ Kennedy did not ask the VE to identify any less-physically demanding jobs because Donald would "grid out at light" exertion work. R. 73; *see* R. 71–74; 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.06. Light work involves lifting or carrying 10 pounds frequently and 20 pounds occasionally plus "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b); *see Bilotta*, 850 F. App'x 164 n.5 (citing SSR 83-10, 1983 WL 31251, at *5).

medium-exertion residual functional capacity ("RFC") allowed him to work as a linen clerk, a dishwasher/kitchen helper, or a dietary aide. *See* R. 15, 19–20.

Donald appealed the Commissioner's final decision to this Court. R. 423. He argued that ALJ Kennedy (1) erred as matter of law by rejecting Donald's statements alleging disabling pain and physical limitations solely because the objective medical evidence did not substantiate those statements, (2) failed to identify any pain-related limitations on Donald's ability to concentrate, and (3) based the RFC finding solely on Donald's physical functioning, while ignoring that "pain itself can be disabling." *See* R. 428. I found Donald's first argument persuasive. *Id.*; *see* R. 436–43; 20 C.F.R. § 404.1529; *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020); *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). I took no position on whether Donald was entitled to DIB during the relevant time. R. 442. Because ALJ Kennedy misapplied the law and did not explain how he considered conflicting evidence, however, I also could not conclude that substantial evidence supported his finding that Donald could perform "medium" work for eight hours a day, five days a week. *See* R. 428 n.4, 436–43. In February 2022, the presiding District Judge remanded Donald's case to the Commissioner under the fourth sentence of 42 U.S.C. § 405(g) for further consideration consistent with my report and recommendation. R. 445–46.

\*

On April 12, 2023, Donald appeared with counsel and testified at a hearing before ALJ H. Munday. R. 383–94. A VE also testified. *See* R. 397–400. ALJ Munday issued an unfavorable decision on May 25, 2023. R. 361–76. She found that Donald had not worked from October 21, 2016, through December 31, 2021.[3] R. 363–64. Donald had two severe medically determinable

---

[3] The latter date is Donald's date last insured ("DLI"). *See* R. 79, 361, 395. To qualify for DIB, Donald must prove that he became disabled on or before his DLI. *See Johnson*, 434 F.3d at 655–56; 20 C.F.R. § 404.101(a), 404.131(b).

impairments ("MDIs") before his DLI: degenerative disc disease ("DDD") and sciatica. R. 364.

These MDIs did not meet or medically equal the relevant Listings. R. 366–67 (citing 20 C.F.R.

pt. 404, subpt. P, app 1 §§ 1.15, 1.16). Turning to Donald's RFC, ALJ Munday found that he

could perform

> medium work as defined in 20 C.F.R. [§] 404.1567(c) except occasional stooping,
> kneeling, crouching, crawling, and climbing ramps or stairs; no climbing ladders,
> ropes, or scaffolds; occasional exposure to vibrations; and occasional exposure to
> hazardous conditions, including unprotected heights and moving machinery.

R. 367. After summarizing the evidence, she concluded that her RFC finding was

> supported by [Donald's] reported activities; his persistent pain complaints with
> admission that his pain was relieved or stable with treatment of medications; his
> mild to moderate deficits on spine MRIs; his mixed signs on exams that improved
> to normal over time; lack of referrals for more invasive treatment, like surgery,
> assistive devices, or spine cord implantation; and the overall objective medical
> evidence of record.

R. 374; *see* R. 368–69 (symptoms analysis); R. 371–72 (narrative RFC assessment).

At step four, ALJ Munday concluded that Donald could not have returned to his past

work as an electrician because the RFC limitation to "no climbing ladders, ropes, or scaffolds"

precluded this work as generally or actually performed. R. 374. Relying on the second VE's

testimony, however, she found at step five that Donald could have performed certain medium-

exertion occupations (linen room attendant, patient transporter, hand packager) existing in the

national economy. R. 375 (citing R. 399). Accordingly, ALJ Munday concluded that Donald was

not disabled from October 21, 2016, through December 31, 2021. *Id.* The Appeals Council

declined to assume jurisdiction, R. 350–53, and this appeal followed.

### III. Discussion

Donald makes two arguments on appeal, both of which relate to ALJ Munday's RFC

finding that he could sustain "medium work" during the relevant time. *See* Pl.'s Br. 8–14. First,

Donald challenges ALJ Munday's analysis of his statements describing constant, severe back

pain and radiculopathy that prevented him from doing the exertional tasks required by medium work. *See id.* at 8–12. Second, he argues that ALJ Munday failed to explain how she concluded—based on the evidence she cited in her RFC assessment—that Donald could perform those tasks. *See id.* at 12–14. The Commissioner responds that ALJ Munday properly discounted Donald's more extreme complaints and logically explained how she concluded that he could perform medium work. *See* Def.'s Br. 11–21. Donald's first argument is persuasive and requires remand.

### A.    *The Legal Framework*

A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his MDIs and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 266, 230–31 (4th Cir. 2011), including objective medical evidence and the claimant's own statements describing his or her medical condition, 20 C.F.R. § 404.1545(a), (e). The ALJ's RFC finding should reflect all credibly established "restrictions caused by medical impairments and their related symptoms" that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1–2; *see Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). The ALJ has broad (but not unbounded) discretion to determine if an alleged restriction is supported by and consistent with evidence in the claimant's record. *See Hines*, 453 F.3d at 564–66; *Perry v. Colvin*, 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

The claimant's symptoms play a critical role in a proper RFC assessment. *See Mascio*, 780 F.3d at 636–37; 20 C.F.R. § 404.1529(a), (c). The regulations set out a two-step framework for ALJs to evaluate symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *id.*, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 639. The claimant's "symptoms, including pain, *will be determined* to diminish" his or her ability to work on such basis "to the extent that [the] alleged functional limitations and restrictions" resulting from those symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence" in the claimant's record. 20 C.F.R. § 404.1529(c)(4) (emphasis added); *see Mascio*, 780 F.3d at 639 ("[T]he ALJ here should have compared Mascio's alleged functional limitations from pain to the other evidence in the record, not to Mascio's residual functional capacity.").

"The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. In doing so, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that he or she is disabled by pain or other symptoms. *See* 20 C.F.R. § 404.1529(c). Such information can include objective medical evidence, like findings on exams or diagnostic studies; the nature and extent of the claimant's daily activities; the type, dosage, effectiveness, and side effects of any medication or other treatment that the claimant uses or has tried to alleviate his or her symptoms; and whether the claimant has failed without good reason to follow prescribed medical treatment that would restore his or her ability to work. *Id.* §§ 404.1529(c)(3), 404.1530(b); *see also* SSR

16-3p, 2017 WL 5180304, at *8–10 (Oct. 25, 2017) (listing these and other factors ALJs may consider when determining the extent to which a claimant's symptoms can reasonably be accepted as consistent with other evidence in the record). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). *See* SSR 16-3p, 2017 WL 5180304, at *10–11. Her articulated reasons for rejecting a claimant's complaints of disabling pain or other symptoms need only be legally adequate and logically supported by an accurate characterization of the evidence she relied upon in concluding that the claimant's complaints were not credible. *See Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 269 (4th Cir. 2017) ("[T]he ALJ must build an accurate and logical bridge from the evidence to his conclusion that the claimant's testimony was not credible." (cleaned up)).

B.    *Summary*

    1.    *Treatment Records*

    In February 2016, Donald saw his primary care physician, Michael Waters, M.D., for an annual physical and follow-up for chronic lower back pain that radiated into the legs. R. 286–88. Dr. Waters had prescribed Fentanyl 100 mcg/hr patches (one applied every two days) and one Percocet 10-325 mg tablet every six hours as need for pain. R. 286. "As far as chronic pain," Donald said that "the Oxycodone [sic] is not very effective and the patches last only one day in reality." *Id.* "When his back is hurting, 'it drains the life out of [him].'" *Id.* Dr. Waters refilled the Fentanyl patches and told Donald to switch from Percocet to Oxycodone 15 mg every four hours as needed for pain. *Id.* In August 2016, Donald told Dr. Waters that the "Fentanyl was changed to [a different] brand, which is not as effective . . . so he has been taking more

Oxycodone and not using the Fentanyl as prescribed." R. 283; *see* R. 305, 307–08. Dr. Waters

refilled both prescriptions. R. 284. That October, Donald told Dr. Waters he had trouble filling

his Fentanyl and Oxycodone by mail. R. 279. He also stopped using "Fentanyl for a time"

because "he found it to be ineffective." R. 279; *see* R. 296, 298–99. Dr. Waters noted that

Donald "increased his intake of oral narcotics" while off the Fentanyl patches, so it seemed "he

was gaining some benefit" from that treatment. R. 279. He refilled the Fentanyl patches and

Oxycodone and gave Donald a 30-day supply of Norco (hydrocodone) to use as needed for

breakthrough pain. *Id.* Dr. Waters's findings on physical exams in 2016 show "mild" kyphosis in

the thoracic spine, diminished strength throughout, and normal gait. R. 280, 284, 287.

On January 13, 2017, Donald told Dr. Waters that he wanted "to get pain relief and

reduce his narcotic intake if possible. Manipulative therapy seems to help." R. 275. He stopped

using the Fentanyl patches a week earlier and was relying on "Oxycodone and/or Norco." *Id.* He

also was "being evaluated by a chiropractor," but he did not know if that was a realistic option

because "his pervious chiropractor would not work with him due to his results on L-spine MRI."

*Id.* On exam, Dr. Waters noted lumbar muscle spasms, negative straight leg raising ("SLR") tests

bilaterally, decreased (4+/5) strength in the lower extremities, and normal gait. R. 276. He

refilled the Fentanyl, Oxycodone, and Norco prescriptions, and added Gabapentin 300 mg up to

"[f]our times a day to help w/ chronic pain." R. 276. Donald did not tolerate Gabapentin; it made

him feel like he was drunk. R. 272.

On April 13, Donald saw Jennifer Edwards, NP, at the Virginia Neurospine clinic. *See* R.

200–02. He reported "constant" 7/10 pain in his lower back that radiated into his right leg. R.

201. Nurse Edwards's findings on exam that day were normal, including "stable" gait and full

(5/5) strength in both lower extremities. R. 202. In June, Donald told Dr. Waters that his lower

9

back pain was "worse after 5 wks of physical therapy." *Id.* A "shooting" pain went down his

right leg when "standing, walking[,] or at other times and especially [doing] physical therapy."

*Id.* "He ha[d] been seeing chiropractic and this seem[ed] to be helping some for his pain." R.

272. Donald still used Oxycodone and Fentanyl patches, but he stopped taking Norco. On exam,

Dr. Waters noted normal gait, lumbar muscle spasms, and reduced strength in both the lower

(4/5) and upper (4+/5) extremities. R. 273. SLR tests were "negative" on the left, but "positive

on the right [at] approx. 90 degrees." *Id.* Dr. Waters refilled the Oxycodone specifically to treat

sciatica pain. R. 274.

Donald had an MRI in late June 2017. It showed "[v]ery mild degenerative changes with

low grade narrowing of the right L3-4 and L4-5 neural foramen." R. 204. On June 29, Donald

told Nurse Edwards that he had "no changes in his symptoms," including persistent 7/10 lower

back pain radiating into his right leg. R. 199. A six-week course of physical therapy did not help.

*Id.* Chiropractic care "improves his ROM but does not alleviate his pain." *Id.* Nurse Edwards

ordered epidural steroid injections ("ESI") at L4-5. *See* R. 199, 221–22, 269. She did not

examine Donald that day. *See* R. 199–200.

Donald established care with James Dailey, M.D., in August 2017. R. 221. He told Dr.

Dailey that he had "moderate[ly]" severe chronic lower back pain radiating into his right leg. *Id.*

He rated his pain as 4/10 on average and 9/10 at worst. *See id.* "[S]tanding and prolonged

standing" exacerbated his symptoms, but opioid analgesics "relieved" them. *Id.* On exam,

Donald's strength was "more than antigravity" in both lower extremities, and he had positive

SLR tests with tenderness to palpation and "decreased" range of motion in the lumbar spine. R.

222. Dr. Dailey administered five ESI between August 9 and October 9, 2017. *See* R. 211–212,

269. On September 12, Donald told Dr. Waters that the injections "hurt like hell" and had no

"beneficial effect" on his back pain. R. 269. "Standing or sitting for a time ma[de] it worse. Walking ma[de] it worse over time." *Id.* "Narcotic analgesics seem[ed] to help." *Id.* Donald still took Oxycodone 15 mg every four hours as needed and used the Fentanyl patches. *See id.* "'It drains the living life out of me,'" he said again. *Id.* Donald described his "chronic pain [as] stable with current medication and activity." *Id.* Dr. Waters refilled the Oxycodone and Fentanyl patch prescriptions. *Id.*

On October 9, 2017, Donald told Dr. Dailey that he did not think the ESI therapy helped. R. 213. "His pain remains about a 7–8 most of the time." *Id.* On exam, Donald's strength was "more than antigravity" in both lower extremities, and he had positive SLR tests with tenderness to palpation and "decreased" range of motion in the lumbar spine. R. 214. Dr. Dailey noted that Donald was "currently on Fentanyl and high dose Oxycodone." *Id.* One week later, Donald told Dr. Waters that he had "fairly constant" lower back pain that was "worse with walking or standing" and "sitting in certain types of chairs. Resting in a fetal position apparently provide[d] relief." R. 266. Donald said he "had good pain relief with the combination" of Fentanyl patches every two days and Oxycodone 15 mg every four hours, but his insurance "denied the [Fentanyl] with the last mailed in prescription." *See id.* Multiple lumbar ESI "did not help with his pain situation." *Id.* In December, Donald told Dr. Waters that his insurance approved the Fentanyl patches and he took Oxycodone 15mg every four hours as needed. R. 263. His "chronic back pain [was] stable with current medication and activity." *Id.* Dr. Waters's findings on exams in 2017 consistently showed normal gait, lumbar muscle spasms, reduced strength in the lower (4/5) and upper (4+/5) extremities, and SLR tests that were "negative" on the left, but "positive on the right [at] approx. 90 degrees." *See* R. 264 (Dec.); R. 267 (Oct.); R. 270 (Sept.); R. 272–73 (June).

Donald saw Dr. Waters for the final time in April 2018. *See* R. 259–62. He reported

"continued . . . problems" with lower back pain that "at times" radiated to one or both legs, but

said that he "has reasonable pain relief with the combination of Fentanyl and Oxycodone." R.

260. Donald "look[ed] forward to accompanying his son to Detroit, Michigan for a robot

competition." *Id.* On exam, Dr. Waters noted "mild" kyphosis in the thoracic spine and normal

gait. R. 261. He told Donald to keep using the Fentanyl patches and taking Oxycodone 15 mg

every four hours as needed for chronic back pain. *Id.* He also renewed an old prescription for

Norco (hydrocodone) 10-325 mg every six hours as needed. *Id.* From March 2018 through June

2018, Donald filled prescriptions for 1,080 Oxycodone tablets, 45 Fentanyl patches, and 120

Norco tablets. R. 259. "All of these were written by Dr. Waters." *Id.* That July, Cynthia Wilborn,

FNP, referred Donald to pain management to evaluate his chronic back pain. *Id.* "[H]e will not

get medication for pain" from the family medicine clinic anymore. *Id.*

On August 27, 2018, Donald told pain specialist Christian Estrada, M.D., that he

"constantly" experienced 7/10 "sharp, stabbing" lower back pain radiating into his right leg. R.

329. Using "high-dose opioid" analgesics and resting in "the right position" eased the pain. *See*

*id.* Non-opioid analgesics, "multiple sessions with PT," and lumbar ESI did not help. *Id.* The

pain was worse with activity, work, and fatigue. *Id.* Dr. Estrada's findings on Donald's exam that

day were "relatively normal," R. 332, including 5/5 muscle strength throughout, full and painless

range of motion, no tenderness to palpation or paraspinal muscle spasms, negative SLR

bilaterally, and normal gait. *See* R. 331–32. The MRI from June 2017 showed only "very mild

lumbar degenerative changes with low grade narrowing of the right L3-4 and L4-5 neural

foramen." R. 332. From Dr. Estrada's perspective, there was "really no clear indication why

[Donald] require[d] high-dose opioid therapy given the minimal findings on MRI and relatively

normal physical exam" at this visit. R. 332. The current dosage (MME = 450) also put him "at high risk" for overdose and death. *Id.* Dr. Estrada told Donald to wean off Fentanyl patches until that "has been discontinued" then wean Oxycodone "down to an MME < 60." *Id.* At that point, he could try another series of ESI "to help with the radicular symptoms." *Id.* Donald disagreed with this new treatment plan. *See id.*

Donald established care with Christina Pavelko, D.O., three days later. R. 343. He had started to wean off the Fentanyl patches, and he had not taken any Oxycodone in five days. *See id.* He took Norco that morning. *Id.* He rated his pain as 8/10. Dr. Pavelko's exam findings were normal except for tenderness to palpation along the spine and "pinpoint tenderness over the spinal process of L2/L3." R. 345. She told Donald to stop taking Norco and to try a prescription pain-relief cream on his lower back. *Id.* She also wrote prescriptions for lower-dose Fentanyl patches and Oxycodone tablets so Donald could taper off those medications. *Id.*

On September 6, 2018, Donald told Dr. Pavelko that his "goals of pain management" were to "feel useful in his life and be able to pick up his granddaughter." R. 339. He had "been off Fentanyl for 3–4 weeks" and was taking the lower-dose Oxycodone plus some amount of Norco that he kept on hand for "emergencies." R. 339. Dr. Pavelko opined that Donald "should be successfully weaned off" the Fentanyl patches by this point. *See id.* However, his drug screen that day came back "positive for Fentanyl and Norco, not positive of Oxycodone." *Id.* He also admitted taking Norco "from [an] unknown source." R. 341. Based on "these inconsistences," Dr. Pavelko declined to prescribe any more controlled substances for Donald. *Id.* She told him to start Cymbalta and follow up in two weeks. *Id.* This is the last treatment note in Donald's record. *See* R. 388, 390–91.

     2.    *Donald's Allegations*

Donald spoke to a DDS employee on August 28, 2018. R. 81. He "voice[d] frustration with [his] current pain management situation." *Id.* Dr. Waters had prescribed pain medications "for several years," but he recently retired, and the provider "who took over sent [Donald] to a pain management clinic." *Id.* The "clinic told him they wouldn't see him unless he was off all pain meds first," so he had to wean off his long-term opioids. *Id.* Donald "said that his functioning varies considerably based on pain levels. However, even with meds, he feels his ability to stand in one place is 'minimal.'" *Id.* He could "do basic ADLs but needs to stop and rest." *Id.* Donald could drive, but "it hurts." *Id.* "He sits in odd positions with pillows in different spots in order to get comfortable." *Id.* By late 2018, Donald was off the Oxycodone and Fentanyl patches entirely. R. 172. He "[t]ried neuropathy creams to no avail." *Id.*; *see* R. 168. His lower back "always hurt." R. 168. The pain "constantly drain[ed] the life out of [him]." *Id.*

Donald testified at the first ALJ hearing in early August 2019. *See* R. 64–70. Asked to explain why he could not work full time, Donald said it feels like a "screwdriver is stabbed into my back. The pain runs down my leg. It drains the energy out of me." R. 64. He had multiple ESIs "to supposedly block the pain" so he could "cut back on the pain pills," R. 64, 67, "but they didn't work," R. 64. "The pain medicine worked." R. 66. But then "the government started cutting back on the use of opioid pain medicine because that's a big no-no nowadays." R. 65. Dr. Waters was "forced . . . into retirement," and Donald "couldn't get opioids anymore." *Id.* He had not had back surgery, R. 64, because he "was told they could not see what to do to fix it," R. 67 (Q: "So you're not a candidate for surgery." A: "No."). Donald drove on a "limited" basis. R. 65–66. He did not "like to drive because it hurts." *Id.* He could stand for "maybe" 15 minutes before needing to sit down. R. 69.

Donald testified before ALJ Munday on remand in April 2023. He had not received any treatment for back pain since 2018 "[b]ecause all of the doctors" told him "there was nothing they could do to help" him. R. 391. Before that, he tried "physical therapy and all the things the doctors recommended." *See* R. 392 (A. "Yeah. I did everything they told me."). He was not a candidate for back surgery. *See id.* Donald took Tylenol, Aleve, or Advil, but "they don't really do [any] good." *Id.* He could stand for "about ten minutes" before needing to sit down. R. 392, 394. He kept a walking stick nearby "in case [he had] to walk further than 20 feet." R. 392. He could "walk 5 minutes" with the walking stick. R. 394. Without it, he could walk 25 or 50 feet. *Id.* Donald spends the "day trying to make [his] back hurt less." R. 393. He does "little back exercises," goes outside, and tries to find a comfortable sitting position. *Id.* Donald "will go get [his] cousin and take him to the grocery store." R. 394. He "washes a load of clothes about once a week." R. 393. He "can't stand at the sink and wash dishes or do anything like that." *Id.*

3.    *The ALJ's Decision*

ALJ Munday summarized most of this evidence in her decision. *See* R. 366 (citing R. 214, 222, 239, 264); R. 368 (citing R. 81, 260, 391–94); R. 369–71 (citing R. 199–202, 204, 213–14, 221, 259–61, 263–64, 266–67, 269–70, 272–76, 279–80, 329, 331–32, 339, 341, 343, 345). Her description of Donald's "alleged symptoms" comes from his testimony at the April 2023 hearing. R. 368 (citing R. 391–94). She concluded that Donald's severe DDD and sciatica "could reasonably be expected to cause the alleged symptoms," but his "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [her] decision." R. 368; *see* R. 368–69, 371–72. Her actual symptoms analysis, R. 368–69, contains only one reason why Donald's statements were "not entirely consistent" with the record.

This reason appears in the very next paragraph: "As for [Donald's] statements about the intensity, persistence[,] and limiting effects of his symptoms, *they are inconsistent because he reported engaging in some activities* that show he is not as limited as alleged." R. 368 (emphasis added) (citing R. 81, 260, 392–94). ALJ Munday cited two examples where Donald described very limited activities and exertional capacities, *see* R. 81, 392–94, and two examples where "he also admitted" that he "drove his cousin to the store and did laundry in his free time" and was "looking forward to accompanying his son to an out of state robot competition," R. 368 (citing R. 260, 393). "In sum," she concluded that

> *despite* [Donald's] testimony that he had *severe exertional restrictions* that included only being able to sit for 10 minutes at a time, needing a walking stick to get around, he had pain with driving, and he needed to rest while doing basic activities of daily living, *he also admitted to* doing laundry, driving his cousin from his home to the store and back regularly, and traveling with his son out-of-state.

R. 368–69 (emphasis added). ALJ Munday stated that she "considered these reported activities in determining" that Donald retained an RFC for medium-exertion work. R. 369; *see also* R. 374 (concluding that this RFC finding was "supported by the claimant's reported activities," among other cited factors).

ALJ Munday also referenced Donald's "subjective complaints," R. 371, immediately before discussing aspects of the medical record that she "considered," and appears to have credited, "in finding that [Donald] could engage in medium work with some postural, vibration, and hazard restrictions" as set out in her RFC finding, R. 372. *See* R. 371–72 (citing R. 199, 203–04, 214, 221–23, 238–41, 260–71, 275–82, 329–32, 339–42). While not explicit, her summary of Donald's complaints here implies a conclusion that numerous treatment notes showing he "alleged constant . . . low back pain with radiation primarily into his legs," R. 371 (citing R. 203–04, 221–23, 238–41, 260–71, 275–82, 329–32, 339–41), were inconsistent with other treatment notes showing "he regularly admitted in 2016 and 2017 that he had improved

16

pain with narcotic medications or manipulative therapy," *id.* (citing R. 238, 269, 272, 275). *See id.* ("In sum, regarding the claimant's subjective complaints, even though he alleged constant . . . low back pain with radiation primarily into his legs, . . . he regularly admitted in 2016 and 2017 that he had improved pain with narcotic medications or manipulative therapy. He even reported improved range of motion with PT." (citations omitted)).

Next, ALJ Munday discussed aspects of the medical record that she apparently found credible, useful, and consistent with her RFC "finding that [Donald] could engage in medium work with some postural, vibration, and hazard restrictions." R. 372; *see generally* R. 371–72 (citing R. 199, 202, 204, 214, 222, 258, 260–61, 263–64, 266–67, 270, 276, 280, 331–32, 341, 345, 372–73). This discussion summarizes specific medical evidence "[r]egarding diagnostic imaging tests" in June 2017; "[r]egarding exams" from October 2016 through August 2018; and "regarding treatment" with Fentanyl patches, Oxycodone, Norco, and lumbar ESI in 2017–2018. *See* R. 371–72 (above citations omitted). ALJ Munday concluded that this evidence established:

> [Donald's] persistent pain with radiculopathy complaints with reported stable, reasonable, or good pain relief on treatment; his mild to moderate deficits on cervical and lumbar spine MRIs; his decreased strength, reflexes, and spine movement with spine tenderness and positive straight leg raise testing at earlier exams with essentially normal exams by 2018, including normal gait, strength, reflexes, straight leg raise . . . and spine movement with no tenderness or spasms; and his positive response to pain medications, patches, and chiropractic sessions.

R. 372. She stated that she "considered" all of this evidence in finding that Donald could sustain medium exertion work. *Id.*; *see also* R. 374 (concluding that her RFC finding was "supported by" the same factors). This part of ALJ Munday's narrative RFC assessment, R. 371–72, does not set out any specific reasons supporting her earlier conclusion that Donald's statements about

the intensity, persistence, and limiting effects of his lower back pain with radiculopathy were

"not entirely consistent with [the] medical evidence and other evidence in the record," R. 368.[4]

B.    *Analysis*

ALJ Munday found that Donald's severe DDD and sciatica could reasonably be expected

to cause the allegedly disabling chronic back pain with radiculopathy that Donald described in

his testimony. R. 368 (citing R. 391–94). She concluded that the record credibly established

Donald's "persistent pain with radiculopathy complaints," R. 372, but that these symptoms still

allowed him to do medium-exertion work with some postural, vibration, and hazard restrictions,

R. 367, 372, 374. *See* Def.'s Br. 16. To pass muster, ALJ Munday's articulated reasons for

rejecting Donald's testimony need only be logically supported by an accurate recounting of the

evidence she relied upon. *See Brown*, 873 F.3d 251, 269. Neither reason meets this deferential

standard of review.[5]

First, ALJ Munday found that Donald's testimony was "inconsistent because he reported

engaging in some activities that show he is not as limited as alleged." R. 368 (citing R. 81, 260,

_____

[4] For example, Donald asserts that ALJ Munday's adverse credibility determination relied in part on treatment notes showing that FNP Wilborn "declined to prescribe further narcotic pain medications" in July 2018 and that Donald "had an inconsistent urine drug screen" in September 2018. *See* Pl.'s Br. 10–11 (quoting R. 371). A fair reading of ALJ Munday's decision makes clear that these are statements of fact summarized from the medical record. R. 371 (citing R. 259, 341). ALJ Munday did not accuse Donald of "deceit" or "falsif[ying] his pain allegations," Pl.'s Br. 10. *See* Def.'s Br. 16–17. Nor did she cite FNP Wilborn's decision to refer Donald to the pain-management clinic, R. 371 (citing R. 256), as a specific reason why Donald's pain allegations were "not entirely consistent" with the medical and other evidence in his record, R. 368. *See* R. 368–69 (reported activities); R. 371 ("reported improved pain" in 2016–2017). This Court must review "the ALJ's decision only upon the reasons [s]he gave." *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988); *see also Fox v. Colvin*, 632 F. App'x 750, 754 (4th Cir. 2015) (citing *Radford v. Colvin*, 734 F.3d 288, 291–92 (4th Cir. 2012)). Accordingly, I will not discuss any conclusions or rationale that are not reasonably apparent from the face of ALJ's Munday's decision. *See Bates v. Berryhill*, 726 F. App'x 959, 960 (4th Cir. 2018) (per curiam) (citing *Patterson*, 839 F.2d at 225 n.1).

[5] The Commissioner's brief lists several purported reasons for the adverse credibility determination, Defs.' Br. 11–15, "but the ALJ's written decision contains none of those justifications," *Bates*, 726 F. App'x at 960 (quoting *Patterson*, 839 F.2d at 225 n.1). *See* R. 368–69, 371.

392–94). She noted Donald described "severe exertional limitations that included . . . pain with driving" and "need[ing] to rest while doing basic activities of daily living," but found that Donald "also admitted to doing laundry, driving his cousin from his home to the store and back regularly, and traveling with his son out-of-state." R. 369. She appears to have rejected Donald's "testimony that he had severe exertional limitations" as inconsistent with her own description of his "reported activities." *See* R. 369.

ALJs should consider relevant information about a claimant's activities as one factor in determining the extent to which the claimant's testimony about the intensity, persistence, and functionally limiting effects of his or her symptoms can reasonably be accepted as consistent with other evidence in the record. 20 C.F.R. § 404.1529(c)(4); SSR 16-3p, 2017 WL 5180304, at *6–7. However, "[a]n ALJ may not consider the *type* of a claimant's activities without also considering the *extent* to which [he or] she can perform them." *Arakas*, 983 F.3d at 99 (quotation marks omitted). If the ALJ rejects testimony describing the limited extent of the claimant's activities, then her decision must build an accurate and logical bridge from other relevant evidence in the record to her conclusion that the qualifying statements are not credible. *See Brown*, 873 F.3d at 269–70. Further, an ALJ who concludes that the claimant's statements concerning the intensity, persistence, and limiting effects of his or her pain or other symptoms are "inconsistent" with the claimant's self-reported activities must logically explain that conclusion. *See Hines*, 453 F.3d at 565–66.

Here, Donald testified that he "washe[d] a load of clothes about once a week," R. 393 (Apr. 2023), and drove on a "limited" basis, R. 65–66 (Aug. 2019). In August 2018, he "said that his functioning varies considerably based on pain levels. However, even with meds, he feels his ability to stand in one place is 'minimal.'" R. 81. One year later, Donald testified that he could

stand for "maybe" 15 minutes before needing to sit down. R. 69. In April 2023, he testified that

he "will go get [his] cousin and take him to the grocery store," R. 394, but he did not say how

often he did so.[6] He could stand for "about ten minutes" before needing to sit down. R. 392, 394.

Donald "can't stand at the sink and wash dishes or do anything like that." R. 393.

ALJ Munday found Donald's testimony was "inconsistent" with his reported abilities to

"do[] laundry" and drive his cousin to and from the store on a "regular" basis. *See* R. 368–69.

However, she did not mention his qualifying statements that he did only one load of laundry a

week, R. 393, and drove on a "limited" basis, R. 65–66. This was error. *Arakas*, 983 F.3d at 99;

*Brown*, 873 F.3d at 269–70. ALJ Munday also did not cite any evidence in the record to support

her finding that Donald "regularly" drove in April 2023, R. 369, which conflicts with his earlier

testimony that he "limited" his driving because it hurt, *see* R. 65–66. *Cf. Steven E. v. Saul*, No.

5:18cv123, 2020 WL 3108711, at *10 (W.D. Va. Jan. 31, 2020) (ALJ's finding that Steven

babysat "often" was not supported by substantial evidence because the ALJ "did not quantify the

term 'often,' and she did not explain whether she found Steven's testimony that he babysat once

or twice a week for at most five hours credible, or whether she thought he babysat more

frequently"). Nor did she cite any evidence that Donald's "reported activities" included

"traveling with his son out of state." R. 369. Indeed, she recognized that Donald merely

"reported *looking forward* to accompanying his son to an out-of-state robot competition." R. 368

(emphasis added); R. 260 (Apr. 2018). There is no evidence in the record that Donald actually

went on this trip. *See Steven E.*, 2020 WL 3108711, at *10; SSR 16-3p, 2017 WL 5180304, at

*11. Even if there was, ALJ Munday did not explain why Donald's testimony that back pain

severely restricted his ability to stand was "inconsistent" with traveling one time during the five-

---

[6] Notably, this was sixteen months after Donald's insured-status expired in December 2021. ALJ Munday
did not mention Donald's August 2019 testimony that he drives on a "limited" basis. *See* R. 65–66.

year relevant period. *See Hines*, 453 F.3d at 565. Accordingly, substantial evidence does not support the ALJ's first reason for rejecting Donald's testimony describing the intensity, persistence, and functionally limiting effects of his lower back pain with radiculopathy.

Second, ALJ Munday implicitly concluded that Donald's subjective complaints of "constant" back pain with radiculopathy, R. 371 (citing R. 203–04, 221–23, 238–41, 260–71, 275–82, 329–32, 339–41), were inconsistent with other evidence showing "he regularly admitted in 2016 and 2017 that he had improved pain with narcotic medications or manipulative therapy," *id.* (citing R. 238, 269, 272, 275); *see also* R. 372 (noting "his positive response to pain medications, patches, and chiropractic sessions"). She also cited treatment records from 2017–2018 documenting Donald's "persistent pain with radiculopathy complaints" but "reported stable, reasonable, or good pain relief on treatment" with Fentanyl patches, Oxycodone, and Norco. *See* R. 372 (citing R. 260, 263, 266, 269).

A claimant's statements describing his or her positive response to medication or other treatment are fair game in the ALJ's symptoms analysis. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *8–10; *see Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). If the ALJ concludes that the claimant's statements about treatment are inconsistent with his or her testimony concerning the intensity, persistence, or functionally limiting effects of an allegedly disabling symptom, the ALJ's decision must build an accurate and logical bridge from the evidence she cited to her conclusion that the testimony was not credible. *See Brown*, 873 F.3d at 269–70; *cf. Vincent v. Colvin*, No. CIV-15-610, 2016 WL 5273031, at *7 (W.D. Okla. Sept. 26, 2016) (the ALJ must consider a claimant's statements about her response to treatment "in the context in which they were made"). Such a "conclusion [is] not supported by substantial

evidence [where] the record, read as a whole, reveals no inconsistency between the two." *See*

*Hines*, 453 F.3d at 565.

The cited treatment notes show that Donald told providers in January and June 2017 that

chiropractic sessions and high-dose opioid analgesics "seem[ed] to help" his back pain. *See* R.

238, 269, 272, 275. He also reported his chronic back pain was "stable with current medication"

in September and December 2017, R. 263, 269; he had "good pain relief with the combination"

of Fentanyl 100 mcg/hr patches plus Oxycodone 15 mg every four hours in October 2017, R.

266; and he had "reasonable pain relief with the [same] combination" of Fentanyl and high-dose

Oxycodone in April 2018, R. 260. At the same time, Donald frequently reported constant 7/10

low-back pain and radiation into his right leg with standing and walking that was worse after

physical therapy and multiple lumbar ESI. *See* R. 199, 201, 213, 266 (Apr., June & Oct. 2017);

R. 329 (Aug. 2018). His symptoms drained the life out of him. R. 286 (Feb. 2016); R. 269 (Sept.

2017); R. 168 (Aug. 2018); R. 64–67 (Aug. 2019). On September 6, 2018, Donald told Dr.

Pavelko that his "goals of pain management" were to "feel useful in his life and be able to pick

up his granddaughter." R. 339. He was still using Fentanyl and Norco, and possibly lower-dose

Oxycodone, at this time. *See id.* By late 2018, however, Donald was off opioid analgesics

entirely. R. 172. He "[t]ried neuropathy creams to no avail." *Id.*; *see* R. 168. His lower back

"always hurt." R. 168. Donald "couldn't get opioids anymore" after Dr. Waters retired. R. 65

(Aug. 2019). He took over-the-counter pain relievers, but "they don't really do [any] good." R.

392 (Apr. 2023).

ALJ Munday appears to have concluded that Donald's testimony describing "severe

exertional restrictions," R. 368, caused by constant back pain and radiculopathy, R. 371, was

inconsistent with a few generic statements suggesting a positive response to high-dose opioids.

22

"This conclusion is not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two," *Hines*, 453 F.3d at 565. For example, the fact that Donald twice described his allegedly disabling "chronic back pain [as] stable with medication," R. 263, 269, is not inconsistent because a medical impairment can be "both 'stable' and disabling at the same time," *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008) ("[A] person can have a condition that is both 'stable' and disabling at the same time."). Donald also told Dr. Waters that pain "drains the living life out of [him]" during one of these visits. R. 269.

Further, the same medical records ALJ Munday cited to show that Donald sometimes reported a "positive response to pain medications, patches, and chiropractic sessions," R. 372, also contain Donald's statements that his chronic back pain and radiculopathy was "worse" after physical therapy and lumbar ESI, R. 238, 272. *See Lewis*, 858 F.3d at 869. ALJ Munday did not explain why she "chose to credit some, but not all, of [his] statements." *Mascio*, 780 F.3d at 639–40. Finally, ALJ Munday failed to acknowledge that Donald's providers stopped prescribing opioid analgesics all together in September 2018. Thus, even assuming that this particular "pain medicine worked" reasonably well for part of the relevant period, *see* R. 64, 260, 266, Donald testified without contradiction that he lost access to opioids more than two years before his DLI, *see* R. 66–65. ALJ Munday should have considered the extent to which this significant change in treatment impacted her credibility finding. *Cf. Lisa F. v. Saul*, No. 3:18cv31, 2019 WL 4605588, at *10 (W.D. Va. Sept. 23, 2019) (directing "the next ALJ to consider Lisa's statements about her pain both 'in the context in which they were made,' and 'in the context of the entire record'" (citations omitted)).

IV. Conclusion

23

I still take no position on whether Donald is entitled to DIB during the relevant time. R. 442. Because ALJ Munday's two stated reasons for rejecting his testimony describing disabling back pain and radiculopathy both come up short, however, I also cannot conclude that substantial evidence supports the ALJ's finding that Donald could sustain medium-exertion work for eight hours a day, five days a week. Accordingly, I respectfully recommend that the presiding District Judge **REVERSE** the Commissioner's final decision dated May 25, 2023, and **REMAND** this matter under the fourth sentence of 42 U.S.C. § 405(g).

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: August 1, 2025

Joel C. Hoppe
United States Magistrate Judge

24